Louis F. Finazzo, Plaintiff-Appellee, v. Mid-States Finance Company (Now, by Change of Name, Luken Finance Company), a Corporation, and Ralph Luken, Defendants-Appellants.

Gen. No. 65–8.

Fifth District.

September 14, 1965.

Modified opinion November 10, 1965.

Emerson Baetz, of Alton, for appellants.

Green and Hoagland, of Alton (Elmer H. Bernard, of counsel), for appellee.

GOLDENHERSH, J.

On March 8, 1956, plaintiff filed suit in the City Court of Alton. (now the Circuit Court of Madison County), against the defendants Mid-States Finance Company, a corporation, and Ralph Luken. Although the record shows the name of the corporate defendant has been changed to Luken Finance Company, it shall be referred to herein as Mid-States, and the individual defendant shall be called Luken.

The complaint as amended, alleges that on April 7, 1952, plaintiff and Mid-States entered into a written contract of employment, that pursuant thereto, plaintiff became manager of Mid-States and performed all duties required of him thereunder; that commencing on February 1, 1953, in addition to his salary, he was to be paid a percentage of the net earnings of Mid-States during each fiscal year. The contract defines "net earnings" as the net income of Mid-States, before all federal corporate income taxes. The contract further provides that any additional compensation due plaintiff shall be paid 60 days after the close of each fiscal year. The contract provides that either party may terminate the employment by giving 30 days' notice in writing, and in the event of such termination, at a time other than the end of a fiscal year, the additional compensation due plaintiff shall be based upon the net earnings of Mid-States during that portion of its fiscal year that shall have elapsed at the effective date of such termination. Mid-States' fiscal year commenced on February 1st and terminated on January 31st.

The complaint further charges that Mid-States failed to pay plaintiff the additional compensation due him for the fiscal years terminating on January 31, 1954,

164

and January 31, 1955. It further alleged a change in accounting methods which reduced the corporate net income, the taking of improper deductions, and other practices violative of the contract, all of which served to distort the net earnings and deprive plaintiff of additional compensation to which he was entitled. These charges are hereinafter discussed with greater specificity, and in such detail as may be required for an understanding of the issues.

In a second count, plaintiff alleges that the defendant, Luken, was the controlling shareholder, and an officer and director of Mid-States and seven other corporations, that he manipulated the assets, income, and expenses of Mid-States and the other corporations for his own benefit and in violation of plaintiff's rights, that said corporate entities were a cloak or screen for Luken's financial manipulations, and prayed that the court disregard the corporate entity, or entities, and enter judgment against Luken for any sum found to be due plaintiff from Mid-States.

In a third count, plaintiff prays an accounting from the defendants, Mid-States and Luken.

Defendant answered, plaintiff replied, and the cause was referred to a master in chancery, to hear evidence and report findings of fact and conclusions of law. After hearings covering 7 trial days, the master filed his report, objections were filed, and sustained in part, a supplemental report was filed, and on January 23, 1964, a decree was filed wherein the court found the issues for plaintiff, found no accounting was necessary as prayed in Count III, since the sums due plaintiff could be determined from the exhibits offered and admitted in evidence, that the defendant Luken had woven an interrelated network of corporate affairs which showed that Luken profited personally from the purportedly corporate transactions, and that subsequent to the termination of plaintiff's employment

165

with Mid-States, defendant Luken had stripped Mid-States of most of its assets. Judgment was entered in favor of plaintiff, and against both defendants, in the sum of $24,332.66 and costs. A motion for rehearing was filed, argued, denied by the trial court on November 20, 1964, and this appeal followed.

The defendant, Mid-States, was organized in 1945. Its principal business was the purchase, from automobile dealers, of negotiable promissory notes secured by conditional sales contracts or chattel mortgages on automobiles. Early in its operations it had obtained funds by borrowing from a bank in Alton, securing those loans by pledging the negotiable paper which it purchased from auto dealers. As its volume of business expanded, it commenced the practice of selling notes to the Alton bank. The notes were sold without recourse, but the bank required Mid-States to maintain a bank deposit based on a percentage of the total face amount of the notes held by the bank.

Defendant's volume expanded to the point where it required additional banking connections, and it entered into an arrangement with Mississippi Valley Bank in St. Louis, whereby it sold notes to that bank. These were handled on an individual basis, with the bank buying certain notes, and rejecting others. Since these notes were sold outright and without recourse, this bank did not require Mid-States to maintain any reserve or guarantee account. Mississippi Valley Bank was merged into Mercantile Trust Company and will hereinafter be referred to as Mercantile.

When plaintiff entered defendant, Mid-States' employ, on April 15, 1952, defendant was selling its notes on the two bases above described. In its accounting, Mid-States used the following procedures: the profits on sales to Mercantile were recognized as interest income immediately upon receipt of the funds; in connection with its sales to the Alton bank, it created

an account designated "unearned income," and thereupon did not recognize any of its receipts from sales of notes to the Alton bank as income until the "unearned income" account equalled 15% of the face amount of the notes then held by the Alton bank. Thereafter it transferred from "unearned income," to "interest income," the amount by which the unearned income account exceeded 15% of the aggregate amount of notes held by the Alton bank.

Plaintiff admits he has been paid all sums due him for services rendered during the fiscal year ended on January 31, 1953. Commencing with February 1, 1953, in addition to his salary, he was to receive a bonus computed on a graduated percentage of Mid-States' "net earnings." At the beginning of that fiscal year on February 1, 1953, Mid-States' balance sheet shows a balance in its "unearned income" account of $74,024.73, all of which arose from its transactions with the Alton bank.

Ralph Welch testified that he was treasurer of Mid-States from July 20, 1953 until April 1, 1956, and during that period was in charge of its books. He stated that in December, 1953, the defendant, Luken, instructed him to create an account designated "unearned income—MT." This account was built up to equal 15% of the total of the notes sold to Mercantile. At the close of Mid-States' fiscal year on January 31, 1954, the balance in that account was $18,341.78. Welch further testified that sums were transferred from the "unearned income—MT" account to earned interest income at various times, dependent upon the volume of business done with Mercantile and the size of the "unearned income—MT" balance. He stated that Luken gave orders for the management of Mid-States and prescribed its accounting procedures. He stated that the employees of Mid-States, including plaintiff, received their instructions from Luken. As

167

of November 30, 1954, the date on which plaintiff's employment terminated, the balance in the "unearned income—MT" account was $69,889.36.

Plaintiff testified that when he and Luken discussed the terms of his employment prior to and at the time the contract was executed, Luken explained to him the methods then in use in Mid-States' dealings with the banks. He stated that Luken told him that in the transactions with Mercantile, the profit on the sales of notes was "chalked up" as soon as received, as distinguished from the transactions with the Alton bank, for which Mid-States maintained the "unearned income" account above described.

Plaintiff contends that the change in the accounting method distorted the earnings of Mid-States, the effect of which was to understate its earnings by $18,341.78 for the fiscal year ended January 31, 1954, and by $51,547.58 for the period between February 1, 1954 and November 30, 1954.

Defendants contend that the accounting change was necessary to reflect the time when Mid-States actually received its earnings, that losses, repossessions, and collection expenses, served to reduce the profits derived from the transactions, and that sound accounting practice required the changed method of keeping this account.

In addition to the reduction of Mid-States' net earnings in the manner above described, plaintiff complains of other transactions and practices which served to further reduce its earnings, and therefore, his bonus. He charges that Luken, in the manipulation of his corporate enterprises, caused Mid-States to make interest free loans to various of Luken's companies, and it was therefore deprived of interest income on these sums. He contends that in computing his bonus, Mid-States' earnings should be surcharged with reasonable interest which Luken's corporations should have paid

for the use of these funds. The evidence shows that on February 1, 1953, various affiliates of Mid-States, all owned and controlled by Luken, owed Mid-States $105,000. At the close of Mid-States' fiscal year on January 31, 1954, these affiliates owed Mid-States $128,477. The sums owed on November 30, 1954, are not shown, but at the close of the fiscal year on January 31, 1955, these affiliated corporations owed Mid-States $115,239.51. As to these transactions, Luken testified that the affiliated companies sold paper to Mid-States on a more favorable basis than would have prevailed except for these loans, and the added earnings thus derived by Mid-States more than compensated it for the loans.

Plaintiff contends that Mid-States' net earnings were further reduced, to his detriment, by management fees paid Luken Enterprises, another of Luken's corporations, in the amount of $6,000 in the fiscal year ended on January 31, 1954, and $3,000 in the year during which his employment terminated. The evidence shows that Luken received a salary from Mid-States during those years, and plaintiff argues that Luken Enterprises did not perform any management services which Luken was not obliged to render Mid-States as its salaried president. Luken Enterprises had two employees during this period, Luken and a secretary. Luken testified as to services allegedly performed for Mid-States by Luken Enterprises, and stated that the amount payable was determined by him, and "was in proportion to services rendered." Mid-States' profit and loss statements offered and admitted in evidence show that for the fiscal year ended January 31, 1952, no management fees were paid; in the year ended January 31, 1953, Mid-States paid $14,100 for "management service," and in the next two fiscal years, being the years involved in this litigation, $6,000 and $3,000, respectively.

169

Plaintiff also contends that in determining his bonus for the fiscal year ended January 31, 1954, the reported net earnings of Mid-States should be increased by the sum of $10,000 paid as a bonus to Helen Luken, wife of the defendant, Ralph Luken. The testimony as to the services performed by Mrs. Luken is conflicting. In his original report the Master in Chancery found that the salary paid Mrs. Luken in each of the two years should not be recognized as a proper item of expense to Mid-States, and recommended that the net earnings used as the basis for computing plaintiff's bonus be increased by the amount of her salary, plus the $10,000 bonus. The trial court sustained defendant's objection and allowed the deduction of her salary, but confirmed the Master's finding as to the bonus. Mrs. Luken testified that although the bonus was paid in 1953, it was paid her for services during the prior fiscal year. Although the testimony is conflicting on this point, the profit and loss statements in evidence tend to corroborate her testimony, since they reflect officers' salaries for the respective fiscal years as follows:

for the year ending January 31, 1952 $24,989.60
for the year ending January 31, 1953 67,730.11
for the year ending January 31, 1954 33,772.00
for the year ending January 31, 1955 24,574.00

The balance sheets show the following accrued bonuses:

for the year ending January 31, 1952 $1,275.60
for the year ending January 31, 1953 31,550.00
for the year ending January 31, 1954 2,786.14
for the year ending January 31, 1955 None

The parties are also in dispute as to the propriety of the payment of a salary to Ray Luken, brother of

the defendant, Ralph Luken. The exhibits show a salary to Ray Luken of $4,200 during the fiscal year ended on January 31, 1954, and $3,500 from February 1, 1954 to November 30, 1954. The evidence as to the services performed by Ray Luken, and the amount of time he devoted to Mid-States' service, is conflicting. Ray testified that he entered Mid-States' employ on April 15, 1952, at which time he took over the bookkeeping. In July 1953, Ray Welch took over the bookkeeping department. After that date, Ray Luken worked in various capacities for several of the Luken corporations, including the management of an ill-fated venture known as Luken Motors. As to Luken Motors, although its stock was issued to Ray Luken, it was actually owned by the defendant, Ralph Luken.

Both the plaintiff, and the defendant, Luken, testified about conversations which took place in April of 1954. Plaintiff stated he had been unable to compute the bonus due him for the preceding fiscal year, that he examined Mid-States' cash disbursement records and prepared a list of items which he thought were improperly charged as expenses. At that time he was not aware of the accounting change and the creation of the "unearned income—MT" account. Luken agreed to plaintiff's figures, and plaintiff was paid a bonus of $2,786.14. This is the amount shown as accrued on the balance sheet as of January 31, 1954. Luken's version of that conversation is substantially the same as plaintiff's. Shortly thereafter, Mr. Welch explained to plaintiff that the accounting change had been made, and plaintiff talked with Luken again. Luken assured plaintiff that the change in the accounting system would "catch up," and plaintiff's earnings would not be affected. Again, Luken's version of the conversation is approximately the same as plaintiff's, with the added statement that it was only

171

a matter of the business getting on the books in sufficient volume to "make up for the change we had set up."

Plaintiff related the difficulties which were encountered in his attempts to expand Mid-States' volume, and his growing dissatisfaction with the business methods prescribed by Luken. He terminated his employment on November 30, 1954, and when he inquired of Luken regarding his bonus, Luken advised him that Mid-States was operating at a loss, and no bonus was due him. Luken tendered plaintiff a check for $200, provided plaintiff would sign a release of all claims arising under his contract, plaintiff refused to accept the offer, and this suit was subsequently instituted.

The Master in Chancery found that subsequent to the execution of the employment contract, defendant, Mid-States, upon the instructions of defendant, Luken, and without the knowledge, approval or consent of plaintiff, made a substantial change in its accounting procedures, the effect of which was to divert $18,341.78 into an "unearned income" account in the one period, and $51,547.58 in the latter period, thereby reducing Mid-States' net earnings by these amounts. He further found that the management fees of $6,000 and $3,000 respectively, were improperly deducted from Mid-States' earnings, because they were actually paid to Luken for services which he was already obligated to perform as president of Mid-States. He also found that the salary paid Ray Luken was not a proper deduction, for the reason that Ray Luken performed no services for Mid-States during the two fiscal periods here involved. He also found that the practice of loaning money, interest free, to other Luken companies, reduced substantially the earnings of Mid-States, and there should be added to Mid-States' in-

come for each fiscal period, interest at the rate of 4% per annum on the sums owed by its affiliates, being interest in one period in the amount of $5,040, and in the other period, $4,609.58. He further found that a bonus of $10,000 had been paid Helen Luken for the period ending January 31, 1954, that this was improper, and should not be recognized as a deduction in computing Mid-States' net earnings for that period. He further found that the defendant, Luken, controlled Mid-States and seven other corporations, that he had woven an interrelated network of corporations and had created such unity of interest, ownership and control, as to indicate that the various transactions were for the benefit of defendant, Luken, permitting him to profit personally at the expense of his corporations, and that subsequent to plaintiff's leaving Mid-States' employ, Luken had stripped Mid-States of its assets.

The Master also found plaintiff was entitled to interest at the rate of 5% per annum on the amounts found to be due, and assessed interest from the dates on which the bonuses were found to be due and payable.

The only definition of "net earnings" contained in the contract before us, is the provision that the term be defined as Mid-States' net income, before all federal corporate income taxes. In the absence of a detailed enumeration of the items to be taken into account in determining Mid-States' net income, the most satisfactory definition available is that net income is what remains after ascertaining the receipts of a business, and deducting therefrom the expenditures necessarily incurred in its operation. Neeson v. Sangamon Mining Co., 316 Ill 397, 147 NE 369.

Because accounting procedures and techniques are many and varied, the past custom and

practice in the operation of the business involved is the best evidence of the intent of the parties. It must be assumed that the methods of determining net earnings will be consistently applied, and that no substantial changes are contemplated without the mutual agreement of the parties. H. R. Zachry Co. v. Terry, (CCA–5) 195 F2d 185. An employer cannot unilaterally change a contract providing for compensation based upon the employer's earnings by a change in its accounting methods, Jackson v. Browning King & Co., 202 Ill App 197, nor, conversely, may an employee require his employer to change his accounting procedures to effect an increase in the employee's earnings. Simply stated, the methods and procedures in effect on February 1, 1953, are determinative of the rights of the parties.

In that light, we shall consider the items upon which the judgment is predicated.

■ The largest single adjustment recommended by the Master in Chancery is the increase of Mid-States' net income by the balance in the "unearned income—MT" account at the close of the two fiscal periods involved. The evidence supports the finding of the trial court that this change was made without plaintiff's approval, and is inconsistent with Mid-States' prior accounting practices.

■ The evidence does not sustain the trial court's finding that Mrs. Luken was paid a bonus during the year ending January 31, 1954. An examination of the exhibits shows conclusively that although this bonus was paid subsequent to February 1, 1953, it was accrued to the prior fiscal year's operations and the payment thereof did not serve to reduce Mid-States' net income in the period here involved.

■ The evidence shows that Mid-States, for at least two years prior to February 1, 1953, had made

174

loans to its affiliates. There is no testimony or evidence in this record to indicate that the affiliates had ever paid interest on these loans. In the absence of proof of any change in Mid-States' practice in the handling of these accounts, the trial court's action in increasing Mid-States' net earnings by interest computed at 4% was error. We further note that the record is barren of evidence as to what rate of interest was reasonable, assuming that any consideration should be given to this item.

■ As stated in the review of the evidence, the record shows that in the fiscal year ended on January 31, 1953, Mid-States had paid management fees of $14,100. Plaintiff, as manager of Mid-States from April 15, 1952 to the end of that fiscal year knew this, or as manager and a corporate director, should have known it. Since payment of management fees was consistent with prior practice in force at the time when the bonus arrangement became effective, defendants deprived plaintiff of nothing by continuing the arrangement.

■ As to the salary of Ray Luken, the evidence supports the Master's finding that no services were rendered therefor. Whatever Luken's motives in continuing his brother on the payroll, although he performed no services, it should not result in loss to the plaintiff. The trial court's findings as to these sums will not be disturbed.

■ The evidence supports the Master's finding that Mid-States' assets have been dispersed into the Luken corporate maze. The record reveals intercorporate transactions obviously designed to create the greatest benefits for the Luken corporations, and indirectly for the defendant, Luken. The corporate veil in this case is gossamer thin, and piercing it requires no great exercise of legal strength or dexterity. The

175

legal fiction of distinct corporate existence will be disregarded when necessary to circumvent fraud. Dregne v. Five Cent Cab Co., 381 Ill 594, 46 NE2d 386, and the trial court's finding will not be disturbed.

■ After computing the sums it found to be due, the court assessed interest "per Chapter 74, section 2, Ill Rev Stat 1953." Interest should be allowed on the amounts found to be due, from the dates on which the bonuses were payable. Groome v. Freyne Engineering Co., 374 Ill 113, 131, 28 NE2d 274.

■ ■ Ordinarily, a case of this type, wherein some findings upon which the judgment is based are approved and some set aside, should be remanded with directions for recomputation of the sums due. As above stated, this litigation has been pending more than 9 years, and in order that it be terminated without further delay, we exercise the power conferred upon this court under Section 92 of the Civil Practice Act (Ill Rev Stats 1963, c 110, § 92) and enter judgment here for the amount found to be due plaintiff, calculated upon the findings hereinabove discussed. The computations upon which the judgment is based, are set forth in the Appendix hereto attached, and judgment is rendered here in accordance therewith.

> Judgment entered in Appellate Court in favor of plaintiff, Louis F. Finazzo, and against the defendants, Mid-States Finance Company (Now, by Change of Name, Luken Finance Company), a Corporation, and Ralph Luken, in the amount of $14,783.60 and for costs. Execution to issue.

EBERSPACHER, P. J. and MORAN, J., concur.

176

For fiscal year ended January 31, 1954

| | | |
|---|---|---|
| Net income before provision for federal income taxes as shown on plaintiff's exhibit 7. | $15,778.99 | |
| Additions agreed upon by plaintiff and defendant, Luken, at time of computing plaintiff's bonus | $17,134.39 | |
| | | $32,913.38 |
| Credits to "unearned Income— MT" account during period | | 18,341.78 |
| Salary paid Ray Luken | | 4,200.00 |
| | | $55,455.16 |
| Bonus computed in accordance with paragraph 4 of employment contract | | $7,738.79 |
| Paid in April, 1954 | | 2,786.14 |
| | | $4,952.65 |
| Interest at 5% per annum from March 31, 1954, to September 14, 1965 | | 2,837.22 |
| Total due for First Period | | $7,789.87 |

For period from

February 1, 1954 to November 30, 1954

| | |
|---|---|
| Net loss as per Mid-States' books | ($12,992.02) |

177

Credits to "unearned income—
MT" account during period 51,547.58

Net income as adjusted $38,555.56

Salary paid Ray Luken 3,500.00

Barbara Luken expense (Not
disputed by defendants) 300.00
 _____
 $42,355.56

Bonus computed in accordance
with paragraph 4 of employment
contract $4,592.45

Interest at 5% per annum from
March 31, 1955, to September 14,
1965 2,401.28
 _____
 Total due for Second Period $6,993.73
 Total due for First Period 7,789.87
 _____
 TOTAL SUM DUE $14,783.60